UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 15-12291-RGS

MASSACHUSETTS INSURERS INSOLVENCY FUND

v.

BEACON ROOFING SUPPLY, INC.,
and BEACON SALES ACQUISITION, INC.

MEMORANDUM AND ORDER
ON DEFENDANTS' MOTION TO DISMISS

February 5, 2016

STEARNS, D.J.

Defendant Beacon Roofing Supply, Inc. (BRS), is a publicly traded distributor of roofing and complementary building products, as well as the parent and owner of defendant Beacon Sales Acquisition, Inc. (BSAI), d/b/a Beacon Sales Company, Inc. Plaintiff Massachusetts Insurers Insolvency Fund (the Fund) is a nonprofit entity organized under Mass. Gen. Laws ch. 175D. The Fund pays claims against insolvent Massachusetts insurance companies where the claimant is a resident of Massachusetts or the insured property is located permanently in the Commonwealth.[1] In this case, the

_____

[1] The Fund is a nonprofit entity "created by the Legislature, for the purpose of settling unpaid claims covered by an insurance policy issued by

1

Fund seeks to be reimbursed for litigation expenses it incurred in defending several asbestos-related lawsuits dating to the 1980s and 1990s.  BRS and BSAI move to dismiss the Complaint.

## BACKGROUND

Beacon Sales Company, Inc. (Beacon I), was a Massachusetts corporation (established in 1928) that sold roofing and building materials. In October of 1984, Andrew Logie and several minority shareholders incorporated Roofing Supply, Inc., and purchased the assets and trade name of Beacon I.  The new owners then changed Roofing Supply's corporate name to Beacon Sales Company, Inc. (Beacon II).  A year later, Beacon I was formally dissolved.

From October of 1984 until January of 1989, Beacon II was insured under a general-liability coverage policy by Centennial Insurance Company (Centennial).  The policy defined the "named insured" as "Beacon Sales Company Incorporated and all Subsidiary, Associated and Affiliated Companies and Entities . . . as they existed, exist now or may hereafter be

---

an insurer that later becomes insolvent."  *Wheatley v. Mass. Insurers Insolvency Fund*, 465 Mass. 297, 298 (2013).  "The Fund is not itself an insurer; rather, it stands in the shoes of the insolvent insurer to provide limited protection to insureds and claimants."  *Mass. Insurers Insolvency Fund v. Mountzuris*, 2009 WL 1663932, at *2 (Mass. Super. Apr. 21, 2009).

constituted." Dkt. # 32-2.  Beacon II was insured by American Motorists Insurance Company (AMICO) from March of 1993 until March of 1997.

In the 1990s, a private equity fund, Code, Hennessy & Simmons II, LLP (CHS), approached Beacon II to discuss a leveraged buyout.  On May 30, 1997, Beacon II shareholders accepted CHS's offer.  In July of 1997, the parties incorporated Beacon Holding Corporation (subsequently renamed BRS) and its subsidiary BSAI in Delaware.  The transaction closed in August of 1997.  At the closing, Beacon II and BSAI executed an Asset Purchase Agreement (APA) conveying Beacon II's trade name "Beacon Sales Company., Inc." and assets to BSAI.

Under the APA, Beacon II sold virtually all of its assets to BSAI, including its trade name, offices, real and intellectual property, inventory, equipment, vehicles, and its employee contracts.  However, the APA expressly excluded "[a]ll Seller's Insurance Policies and rights with respect thereto, including rights with respect to retrospective premium adjustments."  APA, Schedule 1.3(g).  The APA also disclaimed "liabilities arising out of or in connection with . . . death of or injury to persons occurring on or prior to the Closing Date and involving products manufactured by Seller or services performed by Seller on or prior to the Closing Date."  APA, Article 2.2.  Finally, Article 7.20 of the APA provided that:

> [i]n the event that . . . a claim shall be asserted against Purchaser with respect to any matter which may be covered by Seller's insurance coverage. . . . Seller shall, at Purchaser's request, file a claim under such policies and use its best efforts to recover under such policies an amount equal to Purchaser's Losses . . . . In the event of any such recovery, Seller shall promptly remit such funds to Purchaser.

Following the closing, Beacon II ceased doing business and renamed itself Beacon Liquidation. To confuse matters further, BSAI then incorporated a new subsidiary under the name Beacon Sales Company, Inc. (Beacon III). On February 28, 2003, Beacon Liquidation (Beacon II) filed Articles of Dissolution with the Secretary of the Commonwealth. The Secretary subsequently revived Beacon Liquidation each year from 2006 to 2009 to enable ongoing litigation against it.

After the dissolution of Beacon II, a series of tort claims were filed against "Beacon Sales Co., Inc.," seeking damages for asbestos-related injuries allegedly incurred during the operation of Beacon II in the 1980s and 1990s. In addition, two asbestos plaintiffs sued BRS directly for injuries sustained during the operation of Beacon II.[2] The attorneys for BRS and BSAI, who also represented Beacon II at times, argued to the insurer that BRS was entitled to coverage as the successor to Beacon II and because of a

---

[2] There is no dispute that Beacon II was the true defendant in both of these lawsuits.

de facto merger of Beacon II and BRS. Ultimately, AMICO assumed defense of the lawsuits.

On April 27, 2011, Centennial was declared insolvent, and was followed into bankruptcy by AMICO on May 10, 2013. Pursuant to Mass. Gen. Laws ch. 175D, the Fund assumed the defense of the lawsuits still pending against Beacon II. The Fund then sought reimbursement from BRS for its defense of these claims, based on BRS's alleged status as a "high net worth insured" under Mass. Gen. Laws ch. 175D, § 17(3).[3] When efforts to achieve a settlement proved unsuccessful, the Fund filed suit in Suffolk Superior Court on May 18, 2015.

BRS and BSAI removed the lawsuit to the Federal District Court on June 9, 2015, on diversity grounds. On June 15, 2015, BRS and BSAI moved to dismiss under Fed. R. Civ. P. 12(b)(6), arguing that the Fund could not

---

[3] Massachusetts law permits the Fund to "recover from a high net worth insured amounts paid by the [F]und to or on behalf of the insured, whether for indemnity, defense or otherwise." Mass. Gen. Laws ch. 175D, § 17(3). The statute defines a "high net worth insured" as "any insured whose net worth exceeds $25 million on December 31 of the year before the year in which the insurer becomes an insolvent insurer." Mass. Gen. Laws ch. 175D, § 17(1). The statute specifies that "an insured's net worth on that date shall be considered to include the aggregate net worth of the insured and all of its subsidiaries and affiliates as calculated on a consolidated basis." *Id.* It is undisputed that the value of BRS exceeds $25 million. Although the issue need not be resolved here, it would appear that Beacon II (which was purchased for in excess of $29,000,000) also met the definition of a "high net worth insured."

recover from either company because neither company was a named insured under the Centennial or AMICO policies.  This court granted limited discovery for a 90-day period to permit the Fund to seek evidence in support of its theory that BRS and BSAI are corporate alter egos of Beacon II, or alternatively the successors of Beacon II.  Following discovery, the parties submitted additional briefing on BRS and BSAI's motion to dismiss.

## DISCUSSION

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations and quotations omitted).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted).  When the defendant raises a jurisdictional challenge to the complaint, the burden shifts to the plaintiff to overcome it.  *U.S.S. Yachts Inc. v. Ocean Yachts, Inc.*, 894 F.2d 9, 11 (1st Cir. 1990).

### Piercing the Corporate Veil

The court first considers the Fund's corporate alter-ego theory. "One of the basic tenets of [corporate] law is that corporations — notwithstanding relationships between or among them — ordinarily are regarded as separate and distinct entities." *Scott v. NG U.S. 1, Inc.*, 450 Mass. 760, 766 (2008). Piercing the corporate veil is appropriate in two circumstances:

> (a) when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the intercorporate relationship, or (b) when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting. In such circumstances, in imposing liability upon one or more of a group of closely identified corporations, a court need not consider with nicety which of them ought to be held liable for the act of one corporation for which the plaintiff deserves payment.

*My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614, 619 (1968) (internal citations and quotation marks omitted).

The Fund does not allege the first of the two theories, that of "pervasive control" by one corporation of the activities of another. While the Fund references the alternative "single enterprise" theory, Supp. Opp'n at 8, the undisputed evidence is that Beacon II ceased to do business after the sale of its assets and remained in existence for the sole purpose of winding up its outstanding obligations and liabilities. There is no evidence that after the

sale, the assets of the two corporate entities were used interchangeably (the trade name "Beacon Sales" was used singly by BSAI subsequent to the asset purchase).  Because there was no possibility of confusion as to the identity of the entity conducting business, the veil-piercing doctrine does not apply.

### Successor Liability[4]

"It is a settled rule of corporate law that, when one company purchases the assets of another, the purchaser does not thereby acquire the debts and liabilities of the seller."  *McCarthy v. Litton Indus., Inc.*, 410 Mass. 15, 21 (1991).

> The rule is subject to four exceptions: liability may be imposed on the purchasing corporation (1) where the purchaser impliedly or explicitly agrees to assume the liability of the seller, (2) where the transaction is entered into fraudulently to avoid liability, (3) where the transaction amounts to a de facto merger, or (4) where the purchasing corporation is 'merely a continuation' of the selling corporation.

*Id.*  "The doctrine of successor liability is equitable in both origin and nature." *Milliken & Co. v. Duro Textiles, LLC,* 451 Mass. 547, 559-560 (2008).  "Equitable remedies are flexible tools to be applied with the focus

---

[4] BRS and BSAI argue that the court's Order of July 6, 2015, limited discovery to "[the Fund's] corporate alter ego theory," and that the Fund's attempt to substitute a theory of successor liability should be stricken.  Dkt. #17.  The court's Order of August 13, 2015, however, was more broadly worded, permitting discovery as to "corporate identity *and successor issues*." Dkt. # 27 (emphasis added).

on fairness and justice." *Demoulas v. Demoulas,* 428 Mass. 555, 580 (1998).

The terms of the APA were explicit in stating that neither BRS or BSAI were assuming past or future obligations of Beacon II and that the insurance policies would stay with Beacon Liquidation for the express purpose of addressing any such liabilities.  The Fund does not dispute this, and focuses its arguments instead on the "de facto merger" and "mere continuation" exceptions.  In determining whether to characterize an asset sale as a de facto merger, a court is to consider:

> whether (1) there is a continuation of the enterprise of the seller corporation so that there is continuity of management, personnel, physical location, assets, and general business operations; whether (2) there is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation; whether (3) the seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible; and whether (4) the purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

*Cargill Inc. v. Beaver Coal and Oil Co., Inc.*, 424 Mass. 356, 360 (1997).  "No single factor is necessary or sufficient to establish a de facto merger." *Id.*  The First Circuit has also suggested an additional factor: whether adequate consideration was given for the acquired assets.  *See Ed Peters Jewelry Co.,*

*Inc. v. C & J Jewelry Co., Inc.*, 215 F.3d 182, 188-190 (1st Cir. 2000) (applying Rhode Island law).

BSAI does not dispute that Beacon II effectively ceased business operations upon the sale of virtually all of its assets, and that BSAI absorbed its locations, personnel, customers, stocks, and lines of business. Rather, BRS and BSAI contend that the theory of a "de facto merger" fails because the shareholders of Beacon II were compensated in cash ($29 million) and did not receive shares of the new company. While the absence of shareholder continuity is a major factor in determining the existence of a de facto merger, "there is no requirement that there be complete shareholder identity between the seller and a buyer before corporate successor liability will attach." *Cargill*, 424 Mass. at 361. However, shareholder control matters. While the Beacon II management team did eventually acquire some 10% of the shares of BSAI, and the primary shareholder, Andrew Logie, acquired another 20%, corporate control was lodged in a new four-member Board of Directors of which only one (Logie) was a carryover from Beacon II.[5] It is true that BSAI hired Logie as its President and CEO, and hired another of

---

[5] Logie had owned roughly 60% of the shares of Old Beacon, and was the *only* Old Beacon shareholder who purchased shares of the new company, in a purchase that was contingent on his exercise of an option to buy, rather than in an assets-for-shares transaction.

Beacon II's corporate officer, David Grace, as its Vice President for Finance, making them two of the five corporate officers of New Beacon. It is also true that BSAI retained most of Beacon II's salaried managers, each of whom received a small number of shares in the new company.

While continuity of management is a factor in determining the existence of a de facto merger, it only becomes so when the acquisition is undertaken with the intent to defraud creditors or dissenting shareholders. *See Devine & Devine Food v. Wampler Foods*, 313 F.3d 616, 619 & n.3 (1st Cir. 2002) (rejecting a de facto merger argument, under Virginia law, where there was no "wholesale continuity of management or ownership" and no evidence that the transaction was a mere ruse to avoid the seller's liabilities). Moreover, the rule is settled that even where the badges of a de facto merger are present, the successor liability doctrine "has no applicability where, as here, the original manufacturer remains in existence to respond in tort for its alleged negligence and breach of warranty." *Roy v. Bolens Group*, 629 F. Supp. 1070, 1074 (D. Mass. 1986).

The purpose of successor liability is to provide a remedy for injured parties who cannot obtain relief from a corporate predecessor for the harms it inflicted prior to its dissolution. *See Milliken*, 451 Mass. at 556 ("The public policy underlying the imposition of successor liability is the fair

remuneration of innocent corporate creditors.").  The doctrine originates in the principle that "a corporation cannot disable itself from responding to liability for its acts by distributing its assets." *Cyr v. B. Offen & Co., Inc.*, 501 F.2d 1145, 1153 (1st Cir. 1974) (applying New Hampshire law), citing *Pierce v. United States*, 255 U.S. 398, 403 (1921).  One court in this district has described the paradigmatic successor liability case as follows:

> a corporation which is solvent (or if technically insolvent, at least [has] some assets to pay its creditors), transfers its assets in a collusive transaction to another entity in which these same shareholders end up with an equity interest, now unencumbered. The transaction is structured so that the selling corporation is either not paid at all, or is paid with stock which is issued directly to its shareholders. The intended result in all cases is the same, to permit the owners of the selling corporation to avoid paying creditors without losing control of their business. It is this intended result which the successor liability exceptions prevent.

*Nat'l Gypsum Co. v. Cont'l Brands Corp.*, 895 F.Supp. 328, 337-338 (D. Mass. 1995).

There is simply no evidence in the record that Beacon II entered the APA to "shed its debts . . . [and]  continue its business operations . . . and [to] have no further obligation to pay [creditors]." *Milliken*, 451 Mass. at 561. Nor is there any evidence that the original owners sold the assets of Beacon II in a fraudulent attempt to evade Beacon II's liabilities.  The plain language of the APA states that the existing insurance policies were to remain with Beacon II for the precise purpose of making it possible for Beacon II to meet

any obligations that might arise from future litigation.  To assume subterfuge, one would have to confer clairvoyance on the drafters of the APA in foreseeing the materialization of latent tort claims and the bankruptcies (some 13 and 15 years in the future) of Centennial and AMICO.  While hindsight is 20/20, the analysis must focus on the factual context at the time the asset purchase took place without looking to unforeseeable events occurring years later.[6]  I see no real distinction in this regard between this case and the court's rejection of a de facto merger argument in *American Paper Recycling Corp. v. IHC Corp.*, 707 F. Supp. 2d 114, 122 (D. Mass. 2010), where, as here, there was no evidence of a fraudulent intent.  In *American Paper*, the predecessor corporation also, as here, was not immediately liquidated (immediate liquidation being an almost sure sign of fraud), but left with sufficient assets to respond to any foreseeable damages claims.

---

[6] This case illustrates the danger of multi-factor tests, the temptation to count up factors (continuation of the enterprise, absorption of assets, continuity of shareholders, and so on) and to award the argument to the side accumulating the greatest number of factors in its favor, while forgetting what the purpose of the test is in the first place.  Here the test of successor liability should begin with the question of fraudulent intent before proceeding to the various factors that might defeat the usual inviolability of the corporate form, rather than treating fraudulent intent as simply one factor among others.

While the Fund's argument for successor liability is not meritless, Massachusetts has been particularly strict in respecting the "separate entities of different corporations."[7] *Birbara v. Locke*, 99 F.3d 1233, 1238-1239 (1st Cir. 1996) (internal citations and quotation marks omitted). Because in this case there is no evidence of fraud in the acquisition of Beacon II by BRS and BSAI, the court cannot justify imposing successor liability.

## ORDER

For the foregoing reasons, defendants' motion to dismiss for failure to state a claim is <u>ALLOWED</u>.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE

---

[7] The Fund accurately observes that BRS, BSAI, and their attorneys have at times taken opposing positions to the one they now espouse, and argues that they should be judicially estopped from now claiming otherwise. "There are many situations, especially at the outset of litigation, where a party is free to assert a position from which it later withdraws – or even to assert, in the alternative, two inconsistent positions of its potential claims or defenses." *Desjardins v. Van Buren Cmty. Hosp.*, 37 F.3d 21, 23 (1st Cir. 1994) (hospital's status as a public entity open to honest debate). Judicial estoppel applies only when a party has gained an unfair advantage in prior litigation where "the first forum *accepted* the legal or factual assertion alleged to be at odds with the position advanced in the current forum." *Gens v. RTC*, 112 F.3d 569, 572 (1st Cir. 1997) (emphasis in original). There is no evidence that any such litigation advantage has occurred here.